Good morning, Your Honors. May it please the Court. Patrick Toomey for Plaintiff's Appellants. The plaintiffs in this case are challenging what's known as upstream surveillance, the government's warrantless searching of their internet communications. This is a surveillance program of unprecedented breadth, one that involves systematically searching the full contents of messages in real time. Plaintiffs have challenged the surveillance on both statutory and constitutional grounds. The only question before the Court today, though, is whether plaintiffs have plausibly alleged standing. The government asked the Court not to credit plaintiffs' extensive allegations in their amended complaint, but there is no question that applying the same pleading rules that apply in any other case, plaintiffs have plausibly alleged standing. That's precisely the lesson of the Third Circuit's recent decision in the Shushark case, which permitted a similar challenge to Section 702 surveillance to go forward. Here we've alleged that the government is searching plaintiffs' international communications as they travel over the internet backbone, and we've explained in detail how that is taking place. First, we've alleged facts showing that the NSA is copying and reviewing at least some of Wikimedia's trillion or more international communications. Mr. Toomey, do I correctly understand, and this is, of course, probably a question more appropriate for Ms. Dorsey, but do I understand the government contends that if a robot searches, then it's not subject to the Fourth Amendment, as opposed to a human being? It's our understanding that that is one of the government's arguments, and our response is, there are multiple parts to our response. One is that that, even if that were true, it would be a question for the mayor. It's not a question for the governor. It's a question for the plaintiffs' communications as they travel across the wire, and there's no question that the interception of Wikimedia's own communications and those of the other plaintiffs are sufficient to establish their standing to challenge those searches. The Supreme Court has said in Minnesota v. Carter and Ruckus v. Illinois that questions about the legitimate scope of the definition and scope of Fourth Amendment rights are questions for merits and not for the standing. But we would also, of course, disagree with the government's contention that when the government uses a computer or uses a robot, that does not implicate a party's Fourth Amendment rights. If the government sent a robot into your house to look around to find evidence, there's no question that that search would violate the Fourth Amendment and would require a warrant in the way that a search by a human does. So we disagree both on the merits, but also we don't think the court needs to reach that issue at all here because Wikimedia's own communications are being intercepted. I want to say second, our second and another theory of standing is that the government is copying and reviewing substantially all text-based communications entering and leaving the country and including those of plaintiffs. And I just want to want to emphasize we have supported these claims with official government disclosures, a detailed explanation of how the Internet works, credible press reports, and published government documents. Because our factual allegations are detailed and non-conclusory, the court must accept them as true for the purpose of this motion. It must take all reasonable inferences in plaintiffs' favor. Plaintiffs have plausibly alleged a concrete injury, the interception of their communications, and that is all they need to do to establish standing at this stage of the case. Now I want to point out one aspect about the nature of upstream surveillance because it's something that's different in this case and that's new to this program. The government is not simply looking for communications to and from its targets. Instead, it's searching the full contents of communications in order to determine whether they even mention the government's targets. And that's important because it means that the government is systematically examining the emails and web browsing of essentially everyone in the first instance. Looking for, for example, a telephone number. Looking for a telephone number, looking for an email address. That's not the limits of what the government calls selectors, but those are examples of them. And so it's looking through the full contents of communications in the first instance in order to determine which communications it wants to retain for the long term. And our claims and the standing issues in this case turn on the breadth of that initial search. We don't think it's relevant for standing purposes here that the government may discard some of these communications after looking through them. Just as if the government searched everyone's home in Richmond for a particular letter or a particular piece of evidence and it only found that piece of evidence in a way that the government tries to describe the surveillance as targeted here. Just because the government retains only some of the communications at the end of this search process doesn't mean that the initial search and the one on which standing terms isn't far, far broader. And so that is an important dimension of upstream surveillance. And that's something different than the other courts considering previous surveillance challenges have had before them. What are the allegations that you say that plausibly plead this kind of dragnet theory of upstream surveillance that you're talking about? So there's a number of allegations that go to that point in the complaint. Many of them are drawn from the government's own official disclosures. Some of them are contained in the Privacy and Civil Liberties Oversight Board report, which extensively describes surveillance under Section 702 of FISA and has a long explanation of the scope of upstream surveillance and how upstream surveillance is different from other forms of surveillance that the government has conducted in the past. And I can refer the Court to the pages of that report, which is incorporated into our complaint by reference, if that would be helpful. And in fact, that report is quoted in sections of our complaint. Well, I guess my, as I understand it, though, I mean, you've got to show that the government is surveilling substantially all of the relevant communications in this case. And at least the allegations that I think are entitled to a presumption of some truth is that the government is surveilling around or approximately seven choke points, but there are many others. So how do you get around the fact that at least, except for Wikimedia, which I suppose is the exception in this case, how do the other plaintiffs get to show as a plausible matter that their communications are being substantially reviewed? Sure. So I do want to emphasize first that Plaintiff Wikimedia is in a different position. I agree. And has a different set of claims. So setting aside that first theory of standing for Wikimedia and addressing the second theory, which I understand Your Honor is focused on, there are a number of supporting allegations in our complaint. The first has to do with the government's, again, own description of this surveillance. It's, and the PCLOB report describes this as well, the government's stated goals for this surveillance is to comprehensively and reliably acquire communications to, from, and about its targets. And has acknowledged that it has over 100, sorry, nearly 100,000 targets around the world which it's surveilling. Those targets are spread out across the globe and presumably those targets are moving themselves. And the way in which internet communications travel over the internet backbone is inherently unpredictable. So if the government is in fact comprehensively and reliably acquiring the communications of these tens of thousands of targets, it has to be doing so in a way that allows it to capture communications entering and leaving the country at many different places. And, and the structure of the internet backbone, the fact that these, that the backbone is structured in a way that channels communications entering and leaving the country through a limited number of choke points, facilitates the type of comprehensive surveillance that we're describing. Well, I mean, you say that the government has an interest in doing this, this kind of motivation based interest. Is that a plausible allegation or simply a, a conclusion? We think this goes beyond a general interest or motivation to acquire intelligence. Because of the way that internet communications are broken up as they travel over the internet backbone, even a single email may be split into multiple packets. And, and those packets may take different routes across the internet, internet backbone. If the government were to acquire all the, the relevant packets to a communication for a given target, it needs to be conducting the surveillance at many different points. And the same is true of, of communications to and from different people. A communication from me to a friend in London may follow one route across the internet backbone, while that person's response to me, even in, in a text message or an internet message may take an entirely different route. So if you want to have a full picture of, of the communications of your targets, you need to be conducting the surveillance at many, many different points. Well, if Wikimedia has standing, you're home free, right? Well, this, this court and the Supreme Court have said that in, in order for a case to proceed, only, only one of the plaintiffs must establish standing. Right. We agree with that. But we, we would also emphasize that the other. But I'm home free. Yes, Your Honor. I do want to return though to the plausibility standard and to emphasize the question that's before the court. You know, it's, it's black letter law that, that when the plausibility of a complaint is challenged, the government, or sorry, the court must accept all the allegations as true, must take all reasonable inferences in the plaintiff's favor. All well pled factual evidence. You're right. That's correct. All well pled non-conclusory allegations. And, and it, and it has to confine its analysis to the four corners of the complaint and the documents incorporated by reference. Well, of course, we have the Supreme Court's decision in Clapper, right? Absolutely. So we lay down the complaint here against the complaint in Clapper. And in Clapper, they talked about the five problems. And I would have thought that, that you might be addressing those. Of course. In your opinion, in your argument. Of course. So, first I want to emphasize that what the Supreme Court was analyzing in Clapper was not a complaint on a motion to dismiss. It was summary judgment. And what, what the court found was that the plaintiffs had not put forward sufficient evidence. It, it, it found that essentially there was a lack of evidence as to the interception of the plaintiff's communications. That, and the court emphasized in its decision the difference between pleading and proof. It said, well, allegations may suffice at the pleading stage. Specific facts must be put forward at summary judgment. But I want to emphasize at least three other key differences between this, this case and Clapper as well. Before you do that, really, just very briefly, was there discovery in Clapper? No, there was no discovery in Clapper. So it was a pre-discovery summary judgment motion which comes in the door like a 12b6 or 12b1 motion. Go ahead. Sorry. It was pre-discovery. On summary judgment, the plaintiffs did not engage in discovery. And didn't ask for it? No, Your Honor. Right. Okay. Go ahead. I didn't, I just wanted to make sure we understood. Absolutely. Arguably, we're in the same posture. The, the other important differences between Clapper and this case are, are at least threefold. One of, one of them is that the surveillance here is, is very different from the surveillance in Clapper. And I've touched on that already. The surveillance that was challenged in Clapper was targeted surveillance. The, the court found that plaintiffs could only speculate about whether their, their contacts were being targeted. Here, the government is engaging in a dragnet form of surveillance that, that involves systematically searching through the contents of even non-targets communications. And, and that, that goes to the breadth of the surveillance that's, that's at issue here. Second, there's far more that's publicly known about the surveillance in this case. The, the, the plaintiffs in Clapper could only speculate about certain key facts that, that bore on the question of whether the surveillance was even occurring at all. Here, the government has, has officially confirmed many of those facts. For instance, the, the court found that the plaintiffs could not even show that the government had sought to use the authority, that the plaintiffs in Clapper had sought to use the authority that was established under Section 702. They found that the, the plaintiffs couldn't even show that the FISC had approved the surveillance. And, and both of those facts the government has confirmed in this case. The plaintiffs here are challenging a program, a particular program, upstream surveillance that the government has acknowledged is occurring and that the FISC has, has undoubtedly approved. And third, I, I want to emphasize that Plaintiff Wikimedia is in a far different position factually than any of the plaintiffs in Clapper, because of the breadth of its communications. It, it engages in more than, more than a trillion communications every year with individuals, with hundreds of millions of individuals spread across the globe. And, and so I want to emphasize that putting together the government's official disclosures about the surveillance with, with Wikimedia's communications the NSA has acknowledged engage, engaging in a dragnet form of surveillance where, which involves the systematic searching of internet communications. It has acknowledged that it conducts that surveillance on multiple internet circuits. And the surveillance that it describes requires that it look at a minimum at all the text-based international communications flowing across those circuits. Wikimedia engages in so many communications with so many different people around the world, that it's virtually unthinkable that the government could be conducting the surveillance it, it says it's conducting without intercepting at least some of Wikimedia's communications. And, and so those differences, we think, make, make this case very different from, from Clapper. And the Third Circuit recently analyzed, you know, a similar, similar question in the Shushart case. That, that case, of course, involved prism surveillance, not upstream surveillance, but it was analyzing many of the same differences in terms of what is now publicly available, in terms of the difference between the pleading standards and the summary judgment rules. And, and, and so I think that court, that decision is instructive in this case. I want to, I want to emphasize also how we believe this, this court should proceed. We, we believe this court should analyze the, the government's motion as a facial challenge to the plausibility of plaintiff's standing claims. It should, it should find the plaintiffs have plausibly alleged that their communications have been intercepted in the course of this surveillance. And it should then re, remand this case for summary judgment proceedings, just as occurred in amnesty itself. Except you want discovery. We may seek some limited discovery in, in this case. We don't believe, Your Honor, that, that we, we need discovery in order to prevail. We believe that based on what the government has officially disclosed, well understood principles of how the internet works, and the facts that our plaintiffs and our own experts will put forward, that we can establish all the facts that we need to prevail on the merits. However, we, we, we may seek some limited discovery in order to reinforce our claims in this case. So I, I'd like to, to maybe just survey some of the ways in which the district court disregarded the pleading standards here. The, the district court failed to take, failed to credit plaintiff's allegations as true, and it, and it also failed to, to take reasonable inferences in plaintiff's favor. It instead, you know, privileged or favored its own theory of, of events. Events that, that weren't reflected in the complaint, and its own hypotheses about what might be occurring over plaintiff's version of events. And the district court's failure, failure to credit plaintiff's allegations runs against the very pleading rules that this court has emphasized. It has said that a complaint need not be particularly, particularly detailed, and the chances of success need not be particularly likely to prevail on plausibility, but we think that, that the district court disregarded those basic rules. I see my time has expired. Next in rebuttal. Dorsey. May it please the court, Your Honors. Catherine Dorsey on behalf of Defendants at Police. The first thing I want to address, Your Honors, is that this is not a dragnet program, Upstream is not a dragnet program, even according to the allegations contained in plaintiff's complaint and in the PCLOB report, which is incorporated in their complaint. The Upstream program is a targeted program that is intent, designed to collect foreign intelligence information from non-US persons located abroad, and to collect those text-based communications transiting the Internet backbone. I, you know, I, and I, you know, I, I take the government at its word. But in order to get that information, you have to look at a lot of other things that would not, that you conclude ultimately are not your target. But Your Honor, what the plaintiffs, the plaintiffs assume in order to accomplish that, as I think Your Honor is speculating, the same thing, that NSA must be collecting absolutely everything in order to be able to do. Apologies, Your Honor, but that, their allegations do say that. They assume that the only way that the NSA can successfully accomplish the program and to collect that is to collect everything and then sift through it. But that is just pure speculation. There is nothing in, in their allegations that support that the program must operate that way. And in fact, the PCLOB report recognizes that it is a targeted program, that the government is not, and quote, not collecting wide swaths of communications to find the targeted ones. It does say that it, it may require access to a larger body of communications than the ones with to, from, or about targeted selectors. But it does not give any indication as to the precise scope or of, of what that sphere of communications may be collected. Or any details as to how that is done. Those details are all classified. And- Okay, but, but it is, it is common ground that you look, you need more than the to and from. Well, to, from, and about, those are what the NSA is collecting through the upstream program, and again, the PCLOB report says the government may require access to a, and that's at page 111, note 476 of the PCLOB report. But there's nothing to show what sphere of communications is even implicated here. What, what's the, what's the limitation on about? Well- How do you search for something about something without searching nearly everything else? How, how do you do that? Your Honor, again, this is not clear from the details of how this program operates. We know that they, it is, it has been disclosed that they search for communications that contain task selectors, either in the to, from, or about. How that is done is not public information. And plaintiffs only speculate about how it must be done. They speculate that that must mean everything is being collected. And there is no support for that allegation. But if you want to know about every federal Article III judge, the law school from which she or he graduated, wouldn't you search a database of every federal Article III judge to get that information? That would be one way to do it, Your Honor, but there's- All other things held steady. How would you, ex-ante, discover the alma mater of every Article III judge? You could go visit. I mean, there are lots of ways you could engage in that kind of- How would you know, visit who, the judge? Well, no, the alma maters or of every- How, that's, you know, that reminds me of, I was in a meeting the other day and I said, everybody not present, raise your hand. How do you go visit the alma mater of a person when you don't know the identity of that person's alma mater? Well, Your Honor, I'd like to tie it, answer your question, just tying it to specific facts and allegations here, if I may. One of their points is, one of their theories of standing is that they are, the NSA is collecting substantially all communications. And I'd like to drill that down. That is based on the assumption, first of all, that the government is monitoring most or all of what they allege to be 49 choke points of these submarine cables. But they only allege that the government is even monitoring either 7 or 17 of those. That 7 or 17 out of 49 choke points is not substantially all by any means. And then they also allege further, to make the substantially all allegation, that the government must be intercepting every communication at every choke point, but that it does monitor. But the problem with that is, with how the internet works, is each of these choke points where the cables, the submarine cables come through, each submarine cable has sub-cables. And each of those sub-cables has up to 1,000 fiber-optic fibers on which the communications transit. They don't, our lead declaration that we submitted to this district court explained that there is, as a technological matter, you would not have to, the government would not have to collect the communication on the whole sub-cable, it could collect just on the sub-cable. And plaintiffs have offered no allegations that show that the government must be collecting everything that passes through on even one sub-cable. So they haven't met that. But I don't understand how the government would do a very good job if it proceeded as you suggest. If you can't, if they want information more than the to and from, and they might have perfectly good reasons for doing that. I'm not prejudging at all, frankly. I'm heavily for national security. But if they want something more than to and from, they're going to have to look at everything to get the foreign national. But again, that speculates that that is the only way or the best way to do this program. And obviously, the government cannot disclose the details of how it actually does this. But they're speculating that that is the way it is done. And in Clapper, obviously, they indicated, I mean, even the dissent in that case suggested, oh, because NSA has the capability to do this, it seems possible that they could be collecting everything. And the Supreme Court ruled that is not enough for standing. That is speculation. And that's the same situation we have here, Your Honors. So if you go down, you remember that Justice Alito had sort of five reasons. And you would concede that five of those things that made that, not all five are still present, these things that made it speculative. That's correct, Your Honor. So maybe you can go down that list with me. Yes. And the first one, the government will target the communications of non-U.S. persons with who plaintiffs communicate. That still pertains here. That's still speculation. And that's what you most have been talking about, isn't it? Yes. And that the government will succeed in intercepting targeted communications. That's also still speculation here. And plaintiffs also speculate on the last one, that plaintiffs will be parties to intercepted communications. The second and third ones have been? Well, the second one, it depends. It's also not clear that their communications have necessarily, they can show that their communications would necessarily be collected through Upstream as opposed to some other program. So there's a traceability specific to Upstream, and that I think still pertains here. Ms. Dorsey, what about Wikimedia, which at least the plaintiff, say, stands in a different posture, that the government doesn't necessarily need to engage in a dragnet surveillance program in order to gather Wikimedia's communications, given the way Wikimedia operates. What about that? Again, Wikimedia's allegations, as to their standing specifically, are speculative in the meaning of Clapper. And I want to drill down again on each of those, what their allegations are, to say that they generally allege that their communications are so numerous that it's virtually certain the government must be collecting them. The first supposition they rely on is that there are limited pathways traveling internationally on which communications can travel. Again, and this goes to the 49 submarine cables. And so they say there are those limited choke points. And so limited pathways, if they have 1 trillion communications, they assume, you know, they have to transit all those. But again, that's not necessarily true because each choke point has one cable, then multiple sub cables, and then up to 1,000 fibers on each sub cable. So that's not a limited number of pathways. That's a lot of pathways. The next part is that they say their communications, 1 trillion, are so numerous and geographically widespread that they must transit all those paths. But the problem is they say 1 trillion, but they don't provide a denominator for those, that number. So 1 trillion out of how many communications on the internet? And we explained in our lead declaration to the district court that really those 1 trillion, if you look at those, even if you're just considering email sent, it's less than 1%. It's about less than a third of a percent. Do their emails make up within all email traffic? And if you look at web page views, it's even less than that. So again, their communications, when you look at them in terms of everything that's traveling on the internet, are not so numerous that you can assume they're traveling everywhere. The third assumption they make to show they're standing for Wikimedia is that even if they are only monitoring one choke point, they say, again, the government must be collecting some of their communications on that choke point. But again, that assumes that the government is collecting everything on every fiber and every sub cable and every cable on that choke point, which is not necessarily true. That's not the way it has to be. And that's speculation on their part. Alleged things, they sometimes prove not to be true. That's why we have trials. Right, Your Honor. But they have to make a plausible claim. And that's where the rub is. You call it speculation and they call it plausible. Well, here they have, I think you can safely say, they have alleged a possible way of how things operate. But they have not given this court enough to show that it is a plausible claim of how this program actually works. And plausible that it is operating as Dragnet or plausible that Wikimedia's communications are so numerous in the whole context of everything that goes on in the Internet that their communications must be being collected. They have simply not nudged their claim with their allegations from possible to plausible. You agree, of course, that it's well settled that often you will have issues of standing intertwined with the merits such that a court can't really separately determine standing without proceeding into the merits, at least some distance. You don't believe this is that kind of case? That's right, Your Honor. We don't believe that is this kind of case. And yet, and yet, both at the district court and as I read your brief here, although the district court disagreed with you, at least in part, you didn't make a factual challenge to standing. You made a facial challenge to standing. That's incorrect, Your Honor. We made both. The district court only ruled on our facial challenge. Well. That's why we submitted the declarations here to challenge those factual. The district court said your motion, those declarations came later. Those declarations didn't accompany your motion. They came later. As I read the district court's order, the district court says, I don't need to look at the declarations, but they're not properly before me anyway. He chose. The government's making a facial challenge. He chose not to look at them because I think he was worried about that inexplicably intertwined between the merits. And properly so, because. No, Your Honor. I'd like to say, why not? Because here, it's not, plaintiffs need to allege at a minimum here, right? That their communications have been, are being intercepted or implicated in the upstream collection in order to show standing. That is entirely, not entirely, mainly separate from the merits question, certainly not inextricably intertwined, of whether such interception or retention or, depending on which state of the protogram, whether those are unreasonable searches and seizures in violation of the Fourth Amendment. The court doesn't need to decide that here. That's a merits question. But the court does need to decide on the standing, whether they've adequately alleged that their communications are being intercepted. The standing question is not the reasonableness of the search. No, that's the merits. But there's also a part of the merits that asks whether, if it is an unreasonable search, it's the plaintiff's invasion of privacy that's being put at issue. Those are two distinct questions, both on the merits, the latter of which is part of standing. But I think on the stand, that they are certainly not inextricably intertwined here in the way this court has described in Kearns, like where a scope of employment issue was the exact same they were going to decide in the standing versus the merits. And yet your argument is that it is implausible for the court to accept that any of WIC and Media's communications are being searched. That's your argument. Our argument is they have not, the allegations, they have not given specific support to make, specifically alleged enough facts to make a plausible claim that their communications are intercepted. So they would need to embed something in their data transmissions that would alert them when their communication is... Surreptitiously searched. Yes. They would need to get a ping back. That could... Every time the government happened to look at one of their communications? Well, Your Honor, that would be one possible way, I suppose... Really? ...to prove, if they could, you know, if technically that was possible. And I'm saying there are ways to allege standing, but here they didn't even allege how many, you know, that they had a substantial portion of internet communications or something that would get them closer to the mark. That's your denominator argument. But they do say that the nature of their traffic is such that it's diverse all around the world, such that it's inevitable that some portion of that traffic is going to traverse one or more of the government's choke points. What's implausible about that? Because again, we've got, even if you're looking, you've got the cables that they haven't shown that at those choke points, that the government is collecting everything at those choke points. But what they're saying is the nature of their traffic is such that they're traversing against, along all of the choke points. So inevitably, the government has got to be collecting some of that traffic. Well, they say to do the best job of collecting that, right, when traffic can go anywhere, it must be taking everything. And again, there's no allegations to support. That is the way this program actually works. Would an allegation of 90% do? What if they allege government's capturing 90%? Would that do? You see where I'm going, don't you? I can see where you're going, but they haven't even, again... But would 90% do it? I'm not going to concede that 90% would do it. Would 85% do it? Again, I'm not going to concede to... You wouldn't concede that 90% would do it? I'm not going to concede to a number, but they also just can't allege 90% and that's the end of their job. They have to have well-pleaded allegations supported with sufficient factual matter, as Iqbal has held, to make their claim plausible. They haven't done that here, Your Honors. They don't need the dragnet allegation with respect to Wikimedia if you accept their allegation that because of the nature of their traffic, it traverses across all of the choke points, and if the government is surveilling some of them, inevitably, it's going to sweep up some of that traffic. But this court gets to look at how the world works, too, when evaluating standing and a motion to dismiss. And the fact is that the internet doesn't necessarily work the way they're alleging, that the government has to collect everything at one point. How do we know that? We have that in the Lee declarations that talk about that and explain to the court how it's not necessary... It's not before us on this record. The district court decided. It is before this court, and this court can decide the fact. It's not before the district court's record. It was in the district court's record. It's in the file, but it's the district court specifically excluded your declarations from consideration. It chose not to rely on it, but that doesn't mean this court is precluded from relying on those factual declarations to understand how the world works. How would appellate review work if we were free, whatever... A party put in the joint appendix, we were free to look at it when the district court has very explicitly said, this is not a part of my decision. It's an alternative basis on which this court could affirm the dismissal. Those declarations are in the record, and that is part of the appellate record, and this court could affirm the dismissal below on the factual challenge ground, on the basis of those declarations. We'd have to convert this to a motion for summary judgment if we did that, wouldn't we? No, I don't think you would, Your Honor. It would be a factual challenge, and again, we're not in the inextricably intertwined section, so that would need to be converted into a Rule 56. Certainly, at a minimum, if the court disagrees that it doesn't think the factual challenge is before it, we would certainly urge this court, and if you don't think you could affirm on the facial challenge, then we would certainly ask this court to remand for factual challenge proceedings, rather than, as plaintiffs requested, for it to go forward with summary judgment. We think, at a minimum, that the district court should have a chance to rule on the factual challenge, but we think this court can do that on its own. I see that I'm almost out of time. If the court has no more questions, we will— Well, on that last point, it's six of one and a half dozen of another, right? Because if we think there's a factual challenge to be made to standing, then that really does collapse on the merits, does it not? No, I don't think so, Your Honor. I think this court can rule on our—we have presented the factual— I understand that argument, but if we disagree with you on that and we remand the case to the district court, the district court's further standing analysis will take place in the context of a Rule 56 summary judgment proceeding. And then your declarations will be before the court, the plaintiffs can put in declarations, and perhaps the district court would permit some minimal discovery. Well, we think, Your Honor, that the plaintiffs already waived their challenge to oppose the factual challenge. Since we raised that before, they never put in anything in opposition to the factual challenge we raised before the district court. Uh, we would ask this court to affirm the judgment below. Thank you very much. Your Honors, I'd like to just pick up where the court left off. We don't believe that the declarations are properly before this court, just as they were not below the district court. They're not properly before us. I've read and reread the district court's footnote about this, and it seems to me that they're here. Maybe in a matter of, you know, our prudential concerns, we shouldn't decide it now. We should send it back to the district court. But I remember what you said to us first time around. You said you didn't think you would have any discovery, or it would be very limited. You didn't talk about you had a whole bunch of depositions to take or David to insert. We did expressly ask the district court that if it found the government were putting forward a factual challenge, we wanted the opportunity to put in our own declarations, including those that you told. I mean, we could, if we were on television, we could have the court reporter read back the record. But I thought you'd said first time around in response from one of my colleagues that you didn't foresee any discovery or any other evidence that you would put in that you would be happy to stand on the standing arguments that are set forth in your complaint. The allegations in your complaint. That is not what I intended to say, Your Honor. Maybe I misheard you. We fully intend to put in our own facts, including those of our own technical experts. And we would seek also to conduct limited discovery on these issues. We believe those factual submissions and that discovery is appropriate at summary judgment because the issue before the court, the issue of whether the plaintiff's communications are being intercepted is inextricably intertwined with the merits. Well, then let me ask you a follow-up question. When they have put their evidentiary information before the district court, you didn't put anything contrary so that the record as it stands has that in without any contrary evidence from you, correct? We argued to the district court that a factual challenge was impermissible, and we said that the court concluded otherwise, we sought the, we asked for the opportunity to put forward our own factual record. And we said that a factual challenge was inappropriate precisely because the factual issue and dispute is inextricably intertwined with the merits. The question of whether a person's phone was wiretapped or the house was searched, whether the government agents entered the house or not is one of the factual elements of showing an unlawful search. It's clearly intertwined with the merits. And the court found in a much harder case, in the Kearns case, that the facts, the standing facts were intertwined with the merits, and the same is true here. These are issues that under Fourth Circuit law, under Adams, Fuyuru, and Kearns, should only be resolved under summary judgment. I also want to say that, well, my time is up, so if the court has any. Sure. And you said that, it wasn't, but now it is, but go ahead. Apologies. I also do want to say that the government's declaration is misleading and inaccurate on a number of points, including its points about the cables and the fibers, and we plan to rebut those facts with our own technical expert. But again, we believe that it's appropriate to do so at summary judgment. Some of the claims made by the government's witness are actually, in fact, contradicted by materials in the record, including in the PCLOB report and in the other materials that we have cited about the comprehensive nature of this surveillance. The FISC opinion itself indicates that the government is retaining any communication transiting these devices that contains a selector, and the PCLOB analyzes surveillance based on the fact that it is, that the government is conducting comprehensive surveillance  Thank you. Thank you. Mr. Toomey, my curiosity is just tearing me apart. How did Senior Judge Ellis manage to get this case in the District of Maryland? I assume the District of Maryland is not recused or disqualified. Our understanding is that the District of Maryland did recuse itself. It didn't issue an official explanation, but that's it. I was interested in that, too. I inquired of my sources and got no satisfactory answer. Thank you, Your Honor. Thank you very much.
judges: Diana Gribbon Motz , Albert Diaz, Andre M. Davis